### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **HAILEY BOYD, et al.,** | |
| **Plaintiffs,** | **CLASS ACTION COMPLAINT** |
| **v.** | |
| **THE BOSTON BEER COMPANY, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiffs Hailey Boyd and Grace Murtagh ("Plaintiffs"), on behalf of themselves and the proposed Classes, file this Complaint against Defendant, The Boston Beer Company, Inc. (hereinafter "Boston Beer" or "Defendant") and state:

### NATURE OF THE ACTION

1.    For over a decade, Boston Beer entered into and then aggressively enforced noncompetition agreements against all employees, regardless of the nature of their position, their rank, or their job responsibilities.

2.    Noncompetition agreements are governed strictly in Massachusetts for good reason: noncompetition agreements prevent the mobility of employees, suppress employee wages, and stymie innovation.

3.    In Massachusetts, an employer seeking to bind employees to noncompetition agreements when they leave their employment must meet several requirements for the agreement to be valid and enforceable. One requirement is that an employer must provide either garden leave (equal to approximately six months of the employee's highest salary over the preceding two years)

1

or "other mutually-agreed upon consideration…" This protection ensures that employees are fairly compensated during the period that employers prevent employees from working in the industry, either in the form of garden leave or other valuable consideration (such as stock options).

4.      However, Boston Beer undermines this protection and skirts Massachusetts law. Rather than provide garden leave, Boston Beer pays employees $3,000 (less applicable taxes) upon leaving Boston Beer and claims that this is adequate consideration. For context, an employee making $50,000 would otherwise receive $25,000 (less applicable taxes) in garden leave.

5.      Boston Beer does not offer any additional consideration beyond $3,000 for its noncompetition agreement with employees.

6.      This action seeks to hold Boston Beer accountable for its unfair and deceptive actions that violate Massachusetts law.

## **PARTIES**

7.      The foregoing allegations are incorporated by reference and realleged herein.

8.      Plaintiff Hailey Boyd is a resident of Chicago, Illinois, where she is domiciled and maintains her citizenship.

9.      Plaintiff Grace Murtagh is a resident of Chicago, Illinois, where she is domiciled and maintains her citizenship.

10.     Defendant, The Boston Beer Company, Inc. is an incorporated entity under the laws of Massachusetts, maintaining its citizenship therein, and operates its principal office at One Design Center Place, Suite 850 Boston, Massachusetts, 02210.

11.     Upon information and belief, Boston Beer employs sales representatives in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,

Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin.

## JURISDICTION AND VENUE

12.    The foregoing allegations are incorporated by reference and realleged herein.

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 ("CAFA"), because (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interests and costs, and (iii) there is minimal diversity because at least on member of the Class, and Defendant are citizens of different states.

14.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 because Defendant is domiciled in Massachusetts.

15.    Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. 1391(b)(1), as this Complaint is brought in the same judicial district in which the Defendant resides and pursuant to 28 U.S.C. 1391(b)(2), as a substantial part of the events or omissions giving rise to this claim arose in this judicial district.

16.    Title 28 U.S.C. §1331 provides federal question jurisdiction over federal claims. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Massachusetts.

## GENERAL FACTUAL ALLEGATIONS

I.    NONCOMPETITION AGREEMENTS IN MASSACHUSETTS.

17.    A noncompetition agreement is "an agreement between an employer and an employee, or otherwise arising out of an existing or anticipated employment relationship, under which the employee or expected employee agrees that he or she will not engage in certain specified activities competitive with his or her employer after the employment relationship has ended." Mass Gen. Laws ch. 149, § 24L(a).

18.    Noncompetition agreements are widely recognized as harmful to employees and consumers alike.

19.    Noncompetition agreements "often force workers to either stay in a job they want to leave or bear other significant harms and costs, such as being forced to switch to a lower-paying field, being forced to relocate, being forced to leave the workforce altogether, or being forced to defend against expensive litigation."[1]

20.    Noncompetition agreements have larger impacts beyond the employees who are forced to agree to them. As recognized in the Harvard Business Review, "a wealth of research — empirical, experimental, and theoretical studies — offers compelling evidence about the key role that human capital policy, including noncompete contracts, plays in industries and regions. These studies overwhelmingly show that the harms of noncompetes extend not only to employees but to also companies and regional innovation. Noncompetes reduce market dynamism and interfere with a free market for labor. They make it harder to start new companies and cause industries to become more monopolized by incumbent firms. And they reduce employee motivation and knowledge sharing, the fundamental building blocks of innovation."[2]

---

[1] https://www.ftc.gov/news-events/news/press-releases/2024/04/ftc-announces-rule-banning-noncompetes (last visited November 18, 2025)
[2] https://hbr.org/2023/02/banning-noncompetes-is-good-for-innovation (last visited November 18, 2025)

21.     In fact, "studies of changes in state noncompete policies find that when states enforce noncompetes more vigorously, wages fall."[3]

22.     Researchers examining bans on non-compete agreements have found that banning non-competes leads to increased wages by 3-4 percent for both low-wage workers and high-tech workers.[4]

23.     Further, "evidence suggests that consumers are likely harmed by noncompetition agreements, whether by reduced innovation, reduced output, or by higher prices." *Id*. Competition among employers benefits consumers because it creates a more competitive workforce which will in turn create more and higher quality goods and services.

24.     In response to the negative effects of noncompetition agreements on both employees and consumers, the Massachusetts Legislature passed the Massachusetts Noncompetition Agreement Act ("MNAA" or the "Act"), Mass. Gen. Laws 149 § 24L.

25.     In order to be "valid and enforceable", all noncompetition agreements must meet numerous "minimum requirements" set out by the MNAA. These minimum requirements include (but are not limited to) being:

      a.  "no broader than necessary to protect one or more of the following legitimate business interests of the employer: (A) the employer's trade secrets; (B) the employer's confidential information that otherwise would not qualify as a trade secret; or (C) the employer's goodwill";

      b.  "reasonable in geographic reach in relation to the interests protected";

      c.  "reasonable in the scope of proscribed activities in relation to the interests protected";

---

[3] https://eig.org/noncompetes-research-brief/ (last visited November 18, 2025)
[4] *Id.*

     d.   "supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee, provided that such consideration is specified in the noncompetition agreement"; and,

     e.   "consonant with public policy."[5]

26.     In other words, Massachusetts sets a high bar for determining whether a noncompetition agreement is valid and enforceable.

27.     One reason the Massachusetts Legislature sets such a high bar for determining a valid and enforceable noncompetition agreement includes the financial ramifications of an employer enforcing a noncompetition agreement. An employee subject to a noncompetition agreement can be forced to take a lower paying job outside the industry he or she has experience with, or be relegated to having no job at all, resulting in the loss of wages for an extended period of time.

28.     To address the reality that noncompetition agreements lead to a loss in wages, the Massachusetts Legislature requires that any valid and enforceable noncompetition agreement must provide either garden leave or "other mutually-agreed upon consideration."

29.     Garden leave is a unique feature in Massachusetts law that aims to protect employees from the financial ramifications of an employer enforcing a noncompetition agreement. Under the MNAA, a garden leave clause must consist of "at least 50 percent of the employee's highest annualized base salary paid by the employer within the 2 years preceding the employee's termination…" G.L. 149 § 24L(b)(vii).

30.     As an alternative to paying garden leave, the Act provides that the employer and employee may agree to "other mutually-agreed upon consideration." This provision gives

---

[5] G.L. 149 § 24L (b)

employers and employees the freedom to tailor the noncompetition agreement to the unique circumstances of the employment. For example, the parties may decide to provide stock options, more generous vacation terms, earlier vesting of stock units, additional specialized training and support (separate from that already provided by the employer), or access to a company-provided car or living quarters.

31.    However, the Act's allowance of "other mutually-agreed upon consideration" does not give employers license to reduce the amount otherwise obligated under garden leave.

32.    Allowing employers to pay former employees a fraction of what is otherwise due for garden leave would render the Act's garden leave provision meaningless and frustrate the Act's purpose.

## II.    BOSTON BEER'S EXTENSIVE PRESENCE IN THE ALCOHOLIC BEVERAGE INDUSTRY.

33.    Boston Beer is often credited with popularizing craft beer in the United States.

34.    Boston Beer's main beer brand – Samuel Adams – boasts regular offerings such as Samuel Adams Boston Lager, Samuel Adams American Light, and Samuel Adams New England Juicy IPA. Samuel Adams also has limited release beers (such as Samuel Adams Octoberfest and Samuel Adams Winter Lager) and even non-alcoholic beers (Samuel Adams Just the Haze and Samuel Adams Golden).

35.    Over time, Boston Beer expanded its offerings into alcoholic iced tea (Twisted Tea), hard cider (such as Angry Orchard), hard sparking seltzer (Truly), hard soda (HARD MTN DEW), vodka (Truly Vodka), vodka spirits (Sun Cruiser) and whiskey (Twisted Tea Whiskey). In 2019,

Boston Beer acquired craft brewery Dogfish Head, which further expanded the company's offerings into a more niche craft beer market.[6]

36.    Each of Boston Beer's brands appeal to distinct types of consumers and offer a range of pricing options. For example, Samuel Adams appeals to a broader audience, while Dogfish Head appeals to more adventurous craft beer enthusiasts and thus commands a slightly higher price point. Boston Beer's other brands, including Angry Orchard and Twisted Tea, seek to appeal to other segments of the population that desire an alcoholic beverage other than beer.

37.    In addition to alcohol sales, Boston Beer sells other products including branded apparel, accessories, barware, party favors, and other items.[7]

### III.    BOSTON BEER'S NONCOMPETITION AGREEMENTS VIOLATE THE MNAA.

38.    When Boston Beer wishes to employ an individual, it sends an offer of employment that outlines the base salary and certain conditions of employment.

39.    One such condition of employment refers to an "Employment Agreement."[8]

40.    Boston Beer drafted the Employment Agreement, and it is not subject to negotiation.

41.    The Employment Agreement states, in the preamble, that "[i]n consideration of the employment of the Employee by the Company, the Employee's eligibility to participate in the Company's Employee Equity Incentive Plan as set forth therein, the training provided to Employee, and for other good an valuable consideration, the receipt and sufficiency of which are hereby acknowledge, the Employee here agrees with the company as follows…" The Employment

---

[6] https://www.bostonbeer.com/about-us/our-story (last visited November 18, 2025)
[7]    https://shop.samueladams.com/s/shop; https://shop.twistedtea.com; https://trulyoriginals.com; https://shop.angryorchard.com; https://limited.dogfish.com/ (last visited November 18, 2025)
[8] Attached as Exhibit 1 and 2 are true and correct Employment Agreements for Ms. Boyd and Ms. Murtagh, respectfully.

Agreement proceeds to outline duties, compensation, access to proprietary information, non-disparagement, and other provisions.

42.    One provision included in the Employment Agreement is a noncompetition agreement. In the section entitled "Covenant Not-to-Compete", Boston Beer sets out the terms of its noncompetition agreement:

> During the period commencing on the date hereof and continuing until the expiration of one (1) year from the date on which the Employee's employment with the Company terminates (the "Restricted Period"), the Employee shall not, without the prior written consent of the Company, which consent the Company may grant or withhold in its sole discretion, directly or indirectly, for his or her own account or the account of others, in any geographic areas in which Employee provided services to the Company, or about which Employee obtained Proprietary Information, during the last two years of his/her employment by the Company, as an employee, consultant, partner, officer, director or stockholder (other than a holder of less than five percent (5%) of the issued and outstanding stock or other equity securities of an issuer whose securities are publicly traded), or otherwise, engage in the importing, production, marketing, sale or distribution to distributors of any beer, malt beverage, hard cider or product produced by the Company at any time during the Employee's tenure with the Company (i) which is either produced outside of the United States and imported into the United States or produced within the United States and ii) which has a wholesale price within twenty-five (25%) of the wholesale price of any of the Company's products, including but not limited to products marketed under the trade names SAMUEL ADAMS, TWISTED TEA, ANGRY ORCHARD, TRULY and such other trade names as the Company may use to market its products during the Employee's employment with the Company. The Employee acknowledges that he or she has read and understands this provision, and that he or she has agreed to it knowingly and voluntarily, in order to obtain the benefits provided to Employee by the Company. Notwithstanding the foregoing, in the event that you breach your fiduciary duty to the Company, and/or you have unlawfully taken, physically or electronically, property belonging to the Company, the Restricted Period shall be twenty four (24) months from the date of your employment termination; provided, however, that the additional consideration provided for in paragraph 4(d) hereof shall not exceed the additional consideration set forth in paragraph 4(d) in any event.

Employment Agreement at ¶ 4(a).

43.    The noncompetition agreement has two different limitations.

44.     The first limitation is geographic and states that employees are banned from working "…in any geographic areas in which Employee provided services to the company, or about which Employee obtained Proprietary Information, during the last two years of his/her employment by the company…"

45.     Boston Beer's noncompetition agreement does not define what constitutes "any geographic areas" but presumably applies to the location where the employee lives and any location to which the employee traveled to on behalf of Boston Beer.

46.     The second limitation is categorical and states that employees are banned from "engag[ing] in the importing, production, marketing, sale or distribution to distributors of any beer, malt beverage, hard cider or product produced by the Company at any time during the Employee's tenure with the Company (i) which is either produced outside of the United States and imported into the United States or produced within the United States and (ii) which has a wholesale price within twenty-five (25%) of the wholesale price of any of the Company's products, including but not limited to products marketed under the trade names SAMUEL ADAMS, TWISTED TEA, ANGRY ORCHARD, TRULY and such other trade names as the Company may use to market its products during the Employee's employment with the Company."

47.     In other words, the second limitation is nationwide, applies to importing, production, marketing, sale, or distribution (regardless of the specific role occupied by the employee), and covers within twenty-five percent of the wholesale price of any products sold by Boston Beer.

48.     Given vast product offerings of Boston Beer, their differing product pricing, and the highly competitive nature of beer, malt beverage, and hard cider pricing, Boston Beer's second limitation serves as a nearly complete ban from the alcoholic beverage industry. Furthermore,

Boston Beer does not disclose to current or former employees what companies in the alcoholic beverage industry would fall outside Boston Beer's second limitation.

49.    Boston Beer's noncompetition agreement begins when the employment ends and continues for one year.

50.    At the termination of an employee's employment, regardless of whether such termination occurs at the election of the employee or Boston Beer, Boston Beer maintains the discretion on whether to enforce the noncompetition agreement: "[a]t or before the termination date, Employer shall determine whether or not it wishes to enforce or waive the non-competition provision in Section 4(a)…" Employment Agreement at ¶ 4(d).

51.    If Boston Beer elects to enforce the noncompetition agreement, Boston Beer agrees to provide "other consideration", which is separate than the consideration previously identified: "[i]f the Company elects to enforce such provision, the Employee (i) shall comply with Section 4(a), and (ii) the Company shall pay Employee, as additional consideration for his/her compliance with Section 4(a), the amount set forth as such additional consideration in the Offer Letter provided to and signed by Employee.."

52.    In the offer letter, Boston Beer sets forth the amount of "other consideration" for agreeing to its noncompetition agreement: "As a condition of your employment in this position, you are required to sign and return to Boston Beer the attached Employment Agreement…As additional consideration for your agreeing to and complying with the non-competition provision set forth in Section 4(a) of the Employment Agreement, Boston Beer agrees to pay you $3,000 (minus all required tax withholdings) at the time your employment with Boston Beer

terminates…subject to BBC's election, at the time of termination, to enforce the non-competition covenant."[9]

53.    As drafted by Boston Beer, the Employment Agreement "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts."

54.    The offer of employment and Employment Agreement do not include a garden leave clause under the MNAA. Instead, Boston Beer attempts to provide $3,000 (minus tax withholdings) as other consideration under the MNAA.

55.    Further, Boston Beer does not provide any additional consideration beyond $3,000 (minus tax withholdings) in exchange for the noncompetition agreement.

56.    However, Boston Beer invokes its exclusive right to enforce the noncompetition agreement by providing $3,000 (less tax withholdings) to former employees as part of their last paycheck and/or through communicating about the noncompetition agreement with former employees.

57.    Boston Beer's "consideration" of $3,000 is dramatically less than what Boston Beer is obligated to pay in garden leave. To illustrate just how minimal Boston Beer's consideration is, the lowest possible wage earner – an individual paid the federally-mandated minimum wage amount of $7.25 per hour – who worked full time would be eligible to receive $7,540.[10] Of course, the vast majority, if not all, employees subject to Boston Beer's noncompetition agreement are compensated higher than the federal minimum wage.

58.    Boston Beer pays $3,000 (less tax withholdings) in an effort to evade the MNAA and avoid paying additional money as garden leave.

---

[9] Attached as Exhibits 3 and 4 are true and correct offer letters sent to Ms. Boyd and Ms. Murtagh.
[10] An employee making $7.25 per hour, 40 hours per week, 52 weeks a year would earn $15,080. Of course, the Massachusetts minimum wage is set much higher, at $15.00 per hour. If analyzed under Massachusetts' minimal wage laws, the garden leave payment would total $15,600.

59.     Accordingly, Boston Beer has engaged in unfair conduct in violation of the MNAA.

## IV.     BOSTON BEER AGGRESSIVELY ENFORCES ITS NONCOMPETITION AGREEMENT AGAINST FORMER EMPLOYEES.

60.     Boston Beer not only invokes its discretion to enforce the noncompetition agreement with former employees through the payment of $3,000 (minus tax withholdings), it also aggressively polices its former employees future employment relationships with those it deems to be its competitors.

61.     While many employers require only their highest or management level employees to sign non-compete agreements, Boston Beer requires all employees to sign them, regardless of the rank or station of the employees or their job duties.

62.     In addition to requiring all employees to sign their non-compete agreements, Boston Beer proceeds to aggressively enforce them against former employees despite not compensating them with sufficient garden leave.

63.     For example, in 2011, Boston Beer pursued legal action against former sales representative Judd Hausner and his new employer, Anchor Brewing Company, in this Court.[11]

64.     In July 2022, Boston Beer threatened legal action against a former sales representative that went on to work for Heineken after she was terminated by Defendant.

65.     In October 2023, Boston Beer filed a lawsuit against a former employee, Brian Soudant, and his new employer, Downeast Cider House, LLC.[12]

66.     The Soudant complaint states the founder of Boston Beer, Jim Koch, personally and intentionally "reached out" to the owner of Downeast Cider to warn him Mr. Soudant was

---

[11] *Boston Beer Corporation v. Judd Hausner, Anchor Brewing Company LLC, Anchor Brewers & Distillers LLC*, 1:11-cv-11706 (D. Mass) (D.E. 1)
[12] *See Boston Beer Corporation v. Brian Soudant, Downeast Cider House LLC*, 1:24-cv-10029 (Mass. Super. Ct.) (D.E. 30-4)

subject to a non-compete agreement with Boston Beer, which Boston Beer intended to enforce against Soudant and Downeast Cider.

67.    Upon information and belief, Mr. Soudant was terminated from Downeast Cider thereafter.

68.    Shortly after filing suit, Boston Beer dismissed the case against both Mr. Soudant and Downeast.

69.    Boston Beer's aggressive tactics against its former employees are well-known amongst its employees and are meant by Boston Beer to have a chilling effect on employees leaving the company.

70.    As a result of Boston Beer's actions, many former Boston Beer employees are unable to find work following their employment at Boston Beer and remain unemployed for significant amounts of time.

71.    Other former Boston Beer employees are forced to seek employment in other industries or locations out of fear of retaliation from Boston Beer if they seek employment within the alcoholic beverage industry.

72.    Boston Beer's utilization of its noncompetition agreement is aimed at restricting the free market of labor in order to obtain competition advantage over its competitors, interfere with former employees' prospective contractual and employment relationships, and otherwise to gain an unfair business advantage.

## **PLAINTIFF HAILEY BOYD'S SPECIFIC FACTS**

73.    Plaintiff Hailey Boyd was hired as a Brewery Representative by Boston Beer on or about July 2021.

74.    As part of Ms. Boyd's employment, Boston Beer required her to sign an Employment Agreement.

75.    The Employment Agreement contained a noncompetition agreement as outlined herein.

76.    Ms. Boyd's employment with Boston Beer ended on or about August 2025.

77.    Boston Beer elected to enforce the noncompetition agreement, and paid Ms. Boyd $3,000 less tax withholdings; this payment constitutes less than five percent (5%) of Ms. Boyd's annual salary.

78.    Boston Beer has not made garden leave payments following the termination of Ms. Boyd's employment.

## PLAINTIFF GRACE MURTAGH'S SPECIFIC FACTS

79.    Plaintiff Grace Murtagh was hired as a Brewery Representative by Boston Beer on or about August 2019.

80.    As part of Ms. Murtagh's employment, Boston Beer required her to sign an Employment Agreement.

81.    The Employment Agreement contained a noncompetition agreement as outlined herein.

82.    Ms. Murtagh's employment with Boston Beer ended on about April 2023.

83.    Boston Beer elected to enforce the noncompetition agreement, and paid Ms. Murtagh $3,000 less tax withholdings; this payment constitutes less than five percent (5%) of Ms. Murtagh's annual salary at Boston Beer.

84.    Boston Beer has not made garden leave payments following the termination of Ms. Murtagh's employment.

## CLASS ALLEGATIONS

85.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring their claims individually and on behalf of the following Class, which is tentatively defined as follows:

> All former employees of Boston Beer subject to the Employment Agreement who were not paid garden leave following termination of their employment.

86.     Excluded from the definition of the class include the Judge to whom this case is assigned and his/her immediate family and all persons who make a timely election to be excluded from this action.

87.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before or after the Court determines whether such certification is appropriate as discovery progresses.

88.     Numerosity: The Class is comprised of hundreds, if not thousands, of employees of Boston Beer Company throughout the country. The Class is so numerous that joinder of all members of the Class is impracticable. The precise number of Class members is unknown to Plaintiffs, but the precise number and identity of Class members are easily identifiable through Defendant's records.

89.     Commonality: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

   a.   Whether Boston Beer entered into an Employment Agreement with all Class Members;

   b.   Whether Boston Beer invoked the Employment Agreement through payment of $3,000;

   c.  Whether Boston Beer's $3,000 payment constitutes "consideration" under the
       MNAA;

   d.  Whether Boston Beer is obligated to pay garden leave; and

   e.  Whether Boston Beer's enforcement of the noncompetition agreement was unfair
       and/or deceptive.

90.    Typicality: Plaintiffs' claims are typical or the claims of the members of the Class
because, *inter alia*, all Class Members were injured through the uniform misconduct described
above, all members of the Class have entered into the same noncompetition agreements with
Boston Beer, and Plaintiffs are advancing the same claims and legal theories on behalf of
themselves and all Class Members.

91.    Adequacy of Representation: Plaintiffs will fairly and adequately protect the
interests of the members of the Class. Plaintiffs have retained counsel experienced in complex
litigation, including class actions, and Plaintiffs intend to prosecute this action vigorously.
Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to
meet the substantial costs and legal issues associated with this type of class litigation. Plaintiffs
anticipate no difficulty in the management of this litigation as a class action.

92.    Predominance: Boston Beer has engaged in a common course of conduct towards
Plaintiffs and Class Members, in that all claims by Plaintiffs and the unnamed Class Members are
based on the common course of conduct by Defendant in failing to pay meaningful consideration
to Plaintiffs and the unnamed Class Members.

93.    The questions of law or fact common to Plaintiffs' and each Class Member's claims
predominate over any questions of law or fact affecting only individual members of the Class.

Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

94.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Class as is the case at bar, common questions will be held to be predominate over individual questions.

95.     A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and burden of the courts that individual actions would create.

96.     Defendant has acted on grounds generally applicable to the Class by engaging in a common course of conduct by failing to pay meaningful consideration to Plaintiffs and Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

97.     All conditions precedent prior to filing have been met.

<u>**COUNT I**</u>
**VIOLATION OF MASSACHUSETTS NONCOMPETITION AGREEMENT ACT**
**G.L. c. 149 § 24L**
**(On Behalf of All Plaintiffs and the Class)**

98.     Plaintiffs incorporate the preceding paragraphs as alleged above.

99.     Boston Beer entered into a noncompetition agreement with Plaintiffs and members of the Class.

100.    The noncompetition agreement's terms are described herein and are contained in Exhibits 1 and 2.

101.    The noncompetition agreement does not contain a garden leave clause.

102.    Instead of a garden leave clause, Boston Beer claims to offer other "consideration" of $3,000 (less applicable taxes).

103.    The $3,000 amount is payable, at Boston Beer's election, at the termination of the employment relationship.

104.    Boston Beer does not offer any consideration to enter into the noncompetition agreement other than a payment of $3,000.

105.    However, Boston Beer's payment of $3,000 is not "consideration" under the MNAA.

106.    Instead, Boston Beer's $3,000 payment is actually a dramatically lower garden leave payment. Boston Beer offers $3,000 in order to evade the MNAA.

107.    Boston Beer has failed to make a complete garden leave payment under the MNAA to Plaintiffs and the Class.

108.    Nonetheless, Boston Beer has elected to invoke and enforce the noncompetition agreement with Plaintiffs and the Class.

109.    Under the MNAA, the Court can "reform or otherwise revise a noncompetition agreement so as to render it valid and enforceable…"

110.    In order to be valid and enforceable, a noncompetition agreement must either contain a garden leave clause or "other mutually agreed-upon consideration…"

111.    Having failed to provide proper "consideration" under the MNAA, the Court should reform Boston Beer's noncompetition agreement to include a garden leave clause and award Plaintiffs and Class Members the garden leave payments to which they are entitled, calculated as at least 50% of each former employee's highest annualized base salary paid by Boston Beer within the 2 years preceding their termination.

112.    Accordingly, Plaintiffs and the Class are entitled to receive at least 50 percent of their highest annualized base salary paid by Boston Beer within the 2 years preceding their termination.

## COUNT II
### MASSACHUSETTS CONSUMER PROTECTION ACT ("MCPA")
### G.L. c. 93A § 11
### (On Behalf of All Plaintiffs and the Class)

113.    Plaintiffs incorporate the preceding paragraphs as alleged above.

114.    Section 2 of the MCPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

115.    The unfair methods of competition and unfair or deceptive acts or practices alleged herein do not concern the ordinary cooperative circumstances of the employment relationship but instead comprise a marketplace transaction.

116.    By imposing a noncompetition agreement on Plaintiffs and Class Members, Boston Beer is not seeking to govern internal matters but instead is seeking to protect what Boston Beer considers trade secrets, confidential material, and its goodwill.

117.    Plaintiffs, Class members, and Defendant are "persons" pursuant to Mass. G. L. c. 93A § 1(a).

118.    Defendant is involved in "trade" and "commerce".

119.    At all relevant times, Defendant violated and continue to violate the MCPA by:

    a.    Holding Plaintiffs and Class Members to an incredibly restrictive noncompetition agreement without appropriate consideration;

    b.    Failing to make garden leave payments as required by the MNAA;

    c.   Restricting the free market of labor in order to obtain competitive advantage over competitors;

    d.   Interfering with former employees' prospective contractual and employment relationships;

    e.   Attempting to gain an unfair business advantage; and

    f.   Other ways to be demonstrated at trial.

120.    Defendant's conduct is unfair within the meaning of M.G.L. c. 93A because its actions are immoral, unethical, oppressive, and unscrupulous in systematically underpaying consideration for restrictive covenants. Defendant's actions as detailed herein caused and will continue to cause substantial injury to former employees that they cannot reasonably avoid, and the harm substantially outweighs any countervailing benefits.

121.    Defendant's conduct is deceptive within the meaning of M.G.L. c. 93A because it fails to disclose that the $3,000 payment is adequate "consideration" under Massachusetts law when it knows or should know it is grossly inadequate, and fails to disclose to employees that they would be entitled to substantially more compensation under a lawful garden leave policy. These material omissions and misrepresentations would likely mislead reasonable employees acting reasonably under the circumstances.

122.    Defendant performed the actions described herein willfully and knowingly with full awareness that M.G.L. c. 149, § 24L requires either garden leave or adequate mutually-agreed upon consideration. Boston Beer has been on notice of the MNAA's requirements since its enactment and has nonetheless continues to employ the same scheme. Boston Beer's conduct demonstrates a deliberate and systematic scheme to avoid its legal obligations under the MNAA or with reckless disregard of the MNAA.

123.    Defendant has caused a loss of money to Plaintiffs and the Class.

124.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiffs and the Class did not receive the benefit of the bargain, suffered actual damages, and are entitled to trebling, plus attorneys' fees and costs.

125.    Pursuant to Mass. G. L. c. 93A § 9(3), Plaintiffs made a written demand for compensation on behalf of the putative Class to Defendant on October 16, 2025. Defendant has declined to tender a reasonable settlement offer.

## COUNT III
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of All Plaintiffs and the Class)

126.    Plaintiffs incorporate the preceding paragraphs as alleged above.

127.    Boston Beer entered into written contracts with Plaintiffs and Class Members.

128.    Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.

129.    The covenant provides that neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract.

130.    Boston Beer breached the covenant of good faith and fair dealing by:

    a.  Inducing Plaintiffs and Class Members to sign Employment Agreements with noncompetition provisions by representing that adequate consideration would be provided;

    b.  Paying grossly inadequate consideration while simultaneously preventing employees from earning a livelihood in their chosen field; and

    c.  Failing to act in good faith in structuring the consideration for the noncompetition agreement.

131.    Through its actions as stated herein, Boston Beer acted in bad faith and breached the implied covenant of good faith and fair dealing through its wrongful conduct to Plaintiffs and Class Members, as stated herein.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of All Plaintiffs and the Class)**

132.    Plaintiffs incorporate the preceding paragraphs as alleged above.

133.    Boston Beer has been unjustly enriched at Plaintiffs' and Class Members' expense. These benefits include reduced competition, wage suppression, retention of employees, and reaping an unjust windfall by not paying garden leave under the MNAA.

134.    Boston Beer has received significant financial benefits through its wrongful acts stated herein, and Plaintiffs and Class Members have lost financial expectations.

135.    Boston Beer has no valid legal or equitable claim to the financial benefits it has derived from its wrongful acts. It would be inequitable for Boston Beer to retain such benefits.

136.    Accordingly, Boston Beer is entitled to an award equal to the amount of Boston Beer's unjust enrichment so as to divest the inequitable benefits from Boston Beer and return them to Plaintiffs.

**PRAYER FOR RELIEF AND JURY DEMAND**

**WHEREFORE**, Plaintiffs respectfully pray that this Court:

1.    Enter an order reforming or otherwise revising Boston Beer's noncompetition agreement to include a garden leave clause;

2.    Award Plaintiffs compensatory and/or statutory damages – including treble damages and punitive damages, reasonable attorneys' fees, pre- and post-judgment interest, and

any other remedy available pursuant to the causes of action asserted herein, in an amount to be determined at trial.

     3.     Any such other and further relief that the Court deems equitable and proper.

     4.     Plaintiffs demand a trial by jury on all issues so triable.

DATED: December 1, 2025

                      Respectfully Submitted,

Ashley M. Pileika
Massachusetts State Bar No. 709954
Darren R. Wolf
Texas State Bar No. 24072430
**Law Office of Darren Wolf, P.C.**
1701 N. Market Street, Suite 210
Dallas, Texas 75202
P:  214-346-5355 | F: 214-346-5909
ashley@darrenwolf.com
darren@darrenwolf.com

Joel Wertheimer
New York State Bar No. 4922449
**Wertheimer LLC**
14 Wall Street, Suite 1603
New York, New York 10005
P: 646-720-1098
joel@ joelwertheimer.com

Patrick M. Wallace
North Carolina State Bar No. 48138
Jeremy R. Williams
North Carolina State Bar No. 48162
Kathryn Anne B. Robinson
North Carolina State Bar No. 61092
**Lee Segui PLLC**
900 W. Morgan Street
Raleigh, NC 27603
P: 919-421-7781
pwallace@leesegui.com
jwilliams@leesegui.com
krobinson@leesegui.com